We will hear argument next in Numbers 23-2163 and 2164, Guizhou v. United States. Mr. Kahn. May it please the Court? I'm Jordan Kahn with Grunfeld Visedario, representing Guizhou Tire Company and Aeolus Tire. These are publicly traded Chinese tire producers and exporters. They reported to the Department of Commerce that they had minority government ownership by state-owned enterprises. GTC is a quarter owned by a state-owned enterprise, and Aeolus is less than half owned by state  Forty-nine percent. That's correct. Forty-nine percent. Both of these companies, in this case, are challenging Commerce's separate rate denial in the 7th Administrative Review of the Anti-Dumping Duty Order on Off-the-Road Tires, OTR, from China. GTC also challenges Commerce's separate rate denial in the investigation of truck and bus tires from China that was contemporaneously conducted with virtually the same administrative record. That's the next case on the docket. The third case on the docket, the third companion case, is the 5th Administrative Review of the Dumping Order on OTR from China. In that review, Commerce granted GTC a separate rate, but denied it for the majority SOE-owned double coin. In AR5, which you're about to hear later this morning, that tellingly juxtaposes with the cases that we are appealing. That was the prior time GTC was reviewed. GTC was not reviewed in the 6th Administrative Review. In the 5th review, Commerce granted it a separate rate. It found GTC independent from government control. So what changed between the 5th and the 7th Administrative Review? I mean, the evidence changed. This is the way these reviews work, right? The record is separate in every case. Commerce determined in the one that's at issue here that the facts show that even though it's a minority government interest, they effectively control the board. And that board leads to the conclusion that they're de facto controlled. What's wrong with that conclusion, and why isn't there substantial evidence for it? Your Honor, Commerce moved the goalposts. As a matter of law, going back to SKF, Commerce can change its practice if it has sufficient reasons and an adequate explanation. Here, they moved the goalposts because what had changed was the record. The record is different. And we agree, of course, it's sui generis, but we had provided much more information. First off, the SOE ownership decreased from over a third to a quarter. The SOE entity ceased conducting performance reviews of GTC, which they did in 5 and not in 7. In AR-5, when they were granted the separate rate, GTC just made all the standard separate rate certifications. Are you trying to argue that there's somehow — I know you're not arguing that there are stops from changing, but that their reasoning is so inconsistent between 5 and 7 that it's arbitrary and capricious or something like that? Yes, Your Honor. But what's the — the problem is if we accept the facts as they've argued them here, which is that despite the fact that it's minority ownership, it's still effectively government-controlled, because the people that show up at the shareholder meetings are all government entities, and nobody else has any voting power. And the one time the government entity got voted down, they had another meeting three months later and got their position through. Isn't that sufficient evidence to show de facto government control? No, Your Honor. Why not? Well, as an — I mean, let me start with the first proposition. Even if it's a minority of the shareholders, if the facts on the record show that that minority is never voted against, its proposals always go through, and so there's no real opposition or independence from that minority control, that alone should be enough for de facto control, right? Well, that's not what happened here. No, no, no. Answer the question, though. I'm asking a hypothetical now. If it's just a minority control, but they effectively have complete control, nobody will vote against them, everything — they get to pick all the shareholders or the majority of the shareholders of the board. Even if they have picked less than the majority, the ones they pick always get their proposals through. Does that show de facto control? Well, I would — I would say that as long as there still needs to be a nexus to production, commercial, or export decisions — and that's right out of Congress's new regulations. I'm putting that aside because I think our Perella decision kind of addresses that issue, and that's not the question I'm asking you. I'm trying to get at, when can the government decide there's de facto control with a minority shareholder? And it seems to me that if the evidence is pretty clear that no matter what percentage you have, if it's 29 or 49 or whatever, if that shareholder, that government-owned shareholder, is exercising all control, even though there are some supposedly independent shareholders out there, that's enough. Well, again, we need to see actual control. Would you agree that's enough, hypothetically? If there was actual control over production and commercial, if the day-to-day operations were controlled by the SOE, no matter the percentage, I would agree, Your Honor. But we don't think that's the case here. And why isn't it when the people that actually come to vote, the shareholders that come to vote, are all the government shareholders? Well, again, Your Honor, I draw your attention to that May 2015 — Sure, but that, in some ways, is your real problem, is because they may have exercised some independence at the May meeting, but the only people entitled or that have enough of a percentage of shares to call a meeting are the government-owned entities, and when they didn't get their proposal through in May, they called another meeting three months later and did get it through. That seems to me to be the exact evidence of de facto government control. We somehow failed this time, so we're going to exercise our control, because we're the only one that can come to a meeting, and we're going to call meetings until we get our proposals through. That July meeting was perfectly compliant with legal requirements. To remind the Court, the Commerce Department initially found that that was a closed, secret meeting, and they — on remand, they rectified that. If that had happened, if that had happened in secret, as Commerce initially found — It's imperative it's in secret or not. If they're the only ones that can control — can convene a meeting, and they're going to convene meetings to get their proposal voted for until they get what they want, then that seems to me de facto control. Your Honor, we disagree that they're the only ones that can — there are smaller shareholders that can band together and can request — But no single entity can do it, right? That's true. That's true. Do I understand your argument, sir, to be that in a situation where there's minority government control, then actual control of the management is required as opposed to potential? Yes, Your Honor, and that is — I mean, I think that — I understood that to be your answer to all of Judge Hughes's questions. Yes, Your Honor, that is the — that is the standard that is in Commerce's new regulation that has been adopted by the Court of International Trade. And this Court addressed in dicta in the — Adopted by the Court of International Trade? I'm sorry? Adopted? That there has to be actual control as opposed to — Yes, the Anyang, there's a series of — What about this case? In this case, we're submitting that — But this case didn't say there has to be actual control. This case — Said there was potential control. Well, right. Different judges of the CIT. There's a coalescence of CIT precedent recognizing the schism. In this case, the different CIT — I'm just trying to get it straight for what the question is that you're presenting to this Court. Understood. If we disagree with you on that, on the notion that presumptive control doesn't count, only actual, right? Understood. Right. That's right. Then you lose, right? Well, our case at this point depends on the Federal Circuit accepting our argument that in minority cases, there needs to be a demonstration of actual control over the operations and the — Actual control. That's right. Potential control is not enough. And this Court did reference that in Zhejiang machinery, but it was dicta because Zhejiang was a majority case. Before I leave this — And also arguing that commerce is not allowed in a minority control situation to turn the decision on a single one of the factors in the red? That's right. And we understand — we read the Pirelli case, and we understand that there is pushback on that point, the various factors. That said, we do think that there — You read Pirelli to stand for the proposition that commerce can make a decision in a minority case based on the third factor. That's right. That's right. That's a little more than pushback, isn't it? I mean, we're bound by Pirelli. Well, Your Honor, if I could spend my time here — Pirelli would answer two of the questions. One, whether or not they can do it on PROM 3 alone, and secondly, whether or not PROM 3 involves export. Admittedly, yes. Those two arguments you're making are foreclosed by Pirelli? If — yes, we concede that — So what are your remaining arguments? Okay. So the first argument is what I started with, which is the arbitrary reversal of the separate rate between the fifth and seventh administrative revisions. They gave us independent and five. They took it away. That's arbitrary and capricious. That's — Well, there's more than that. This is — the Supreme Court in FCC versus Fox said agencies need a more detailed justification. I mean, the point — I'm just trying to cut through all of the — Understood. — talk to see exactly what the issues are that we have to decide. Two of them have been decided by Pirelli. So the issue — The third one is it was arbitrary. They gave you independent once. Nothing changed. They should give it to you again. And they should have — well, they should have a heightened explanation because they — their separate rate denial rested upon factual findings. Well, that's tied to the same issue. We see this as being a distinct issue, this reversal. No, it was arbitrary and capricious. If they had a good reason to state, you wouldn't be making the argument. Understood. That's our second — that's our second. That's three in the argument. What's the fourth argument? Okay. So let's talk about substantial evidence, as Judge Hughes wants to hear about. So in Pirelli, there was the evidence that was — I just want to be clear. Have we — where does this actual control versus potential control fit in? Is that something different from what Pirelli decided or what? Okay. So Pirelli involved a minority share, but they — you didn't include the language that we think is important and we think still should be there about, quote, additional indicia to deny separate rates, which we see as showing actual control. And that comes from — And by actual control, do you mean actual directives or the actual ability to force something, even if it never had to be exercised? In the words of Commerce's regulation, to have control over production and commercial or export decisions. Now, I understand that the — I'm sorry. I thought the two adjectives, actual and potential, in front of the word control, were meant to distinguish two different things. No? I thought what you just said was actual control means control over the production, whatever.  That's right. Is that actual or potential? No. Potential control is they can pick the board members. And so therefore, they have a potential to, you know, to control. But they are, in a majority context — So it's the object of — I mean, the linguistic object of control that you're — that you're fascinated — you're focusing on. One is control the selection of the decision makers inside the company. The other is to control the particular decisions. Yes, Your Honor. I see. Okay. But that's rather a lot of what Pirelli was about. Well, okay, if I can talk about — one of the things that Pirelli was about was about the substantial evidence, which we all know is the ultimate backstop about what commerce can do. And in that case, there was issues about the evidence being properly on the record. There was Italian law that I understand was not submitted. Here, everything is on the record. And one of the points that Commerce hung their hat on that this Court affirmed was the annual report of Pirelli talking about control by the SOE. If you look at GTC's annual report — this is on APPX 2205-08 — quote, So we see this as a very important distinction. And another important distinction that we see involves overlapping management. So there was a key finding in Pirelli that it was the same individuals that were on the SOE that were on the respondent. And from my perspective, even though that's a minority case, that is ultimately beholden. If you have the same individuals working on both — what's called overlapping management — here, there's nothing like that. The GTC members do not have any position in the SOE or any other government agency. So this lack of overlapping management between GTC and the state-owned entity contrasts with that finding in Pirelli. And so from our perspective, that is a very critical distinction. So we think the record is more robust. And we have — we think that the — you know, the other evidence that is properly on the record is we have a statement from the SOE entity. We call it the SASAC clarification. This is APPX 2769-70, where it confirmed — quote, That it does not have the authority to make decisions for GTC. End quote. Does not have the right to make a decision. But if it has the power to appoint all the board of directors, and those people control the management, is it a reasonable assumption that they're directing — I mean, isn't this what all of this has been about, and it's in Pirelli, too? Even if they have some kind of statement that says, we don't control the decisions, if you control and select the managers that make the decisions, you're effectively controlling the decisions. We submit that that proxy, that administrative shortcut makes sense in a majority ownership context. But as the CIT has held, there needs — I don't understand this distinction. Because, sure, in a majority-controlled situation, that's obvious. I mean, if you have the majority of the shareholders, and you get to select the board, the board's going to be beholden to you. But that doesn't mean that can't happen in a minority-owned case, too. Because it may be that the government holds a minority block that's still effective in controlling. Isn't it the case here that the government-owned entity — and I hope I'm not getting into confidential stuff. I found this case overmarked. But if I start to, you can tell me, put your hand up. The government entity selected the board of directors here. There's no evidence that independent shareholders independently selected any directors, is it? Are you talking about the original board back in 2012 or that 2015, those two meetings in 2015? What's the difference? Well, one is before the period, at a time when commerce recognized the separate rate. And that was when the majority of the board was appointed. Sure. But they still selected the board. And are those board people still there? I mean, what does it make — so the 2015, did somehow a group of independent shareholders get together as a block and elect independent directors of the board that have management control? No, but they blocked the SOE's initial effort to do so. And we submit that that puts away the proxy and the presumption. And that means that it needs to be — That block didn't last very long, though. It lasted three months. Why is — I don't understand why you're arguing that. That seems to disprove your point that they have any independent control. Because the one time they managed to do it, because somebody didn't have their eye on the ball, it was quickly reversed. Well, I think it goes to show it could have been reversed again. That there's — in other words, this concept, this construct of treating majority companies as, OK, you know, the SOE can elect the board, and that is ultimately — that has been disproven here. And so the substantial evidence requires an additional indicia, more than just being able to vote. And we submit that that additional indicia is not on this record. I see that I'm into my rebuttal time. Thank you. Thank you. We have — oh, do you want to — I just — on the confidentiality, I don't know how I'm supposed to understand what in your blue brief is confidential. I don't understand how you chose to show us. Was it by bolding things? We use brackets, Your Honor. Square brackets. There's not much. If you look at the table — They're hard to see, but if you squint. Thank you. OK. In the table of contents, there's a legend identifying which pages have them. Thank you, Your Honor. Thank you. Yes, you can see me. Good morning, and may it please the Court. Pirelli controls. The facts of this case are pretty much on all fours. Don't we have to do a little bit more here? Because you did go the other way in the fifth review, and it seems like the structures and everything, and even the board there, was largely the same. If you've already found them to deserve a separate rate in the fifth review, don't you have to explain in a little bit more detail why we've changed our mind, even though the facts are different or things like that? Well, the trial court in ATC, Advanced Technology, issued an opinion basically holding that if the shareholders, without really discussing whether it's a majority or minority, are able to select the board, then the reasonable inference that can be drawn from that is that the board selects the management and therefore has control over export activities. And Commerce amended its practice to comply with that trial court decision, which was never appealed. And then after that occurred, this court sustained that practice in Pirelli, going all the way back to Sigma and the earlier cases. I'm sorry. Can you relate that change to the A5, A7 difference? Well, in the intervening time, in about 2016, was when the ATC trial court decision came out. So it was shortly before the Commerce Department made the determinations at issue in this case. So Commerce- But after the A5 determination? It was after the A5 determination and then- but before this determination. I think this was A7. So- or A8. So- But Pirelli is after all that. But Pirelli is in February of this year. And so the court has since made abundantly clear what practice, or at least what Commerce needs to do in non-market economy countries. And it's exactly what it did here. I'm sorry. I just- I think something is quite obvious to you that I need spelled out in greater detail. And then there's- A5, you said it was separate, separate rate. Why was that no longer a valid conclusion to draw after the CIT made the decision about director control? Proceeding before this case, the Commerce Department did not draw the same- look with the same detail into board composition and draw that same inference as to whether control of the board would therefore translate into control of management activities, such as exports. The ATC- Can I ask you a question? At the time of A5, was it just Commerce's position that if it was majority government control, then it was control? And if it was minority, it wasn't? Was it that simplistic? Yes, it was that simple. And so since that time- You've taken a more nuanced view and recognize that even minority control can be effectively control by evidence that shows they exercise their voting power and shares in a way that gives them de facto control over the board and thus the management. Right. And that's absolutely true. And that's exactly what Commerce did here. It did a deep dive into the record. It looked at the minutes of shareholder meetings in the years leading up to and the year during the period of review here. And the shareholder meetings that Judge Hughes discussed were very important to the agency's analysis. That's with respect to GTC. With respect to Aeolus, the other company, in addition to the 49% ownership, the largest shareholder, China Chem, in its own website stated that it controlled Aeolus. And so that was substantial evidence that certainly overcame any countervailing evidence that the plaintiffs tried to place on the record to meet their burden of persuasion. And Aeolus also previously had an independent rate? I'm not sure about Aeolus. Okay, but this is GTC we're talking about? GTC we're talking about, yes. Okay. And also one thing that plaintiffs really cannot allege is that they have some sort of, once they receive a separate rate, that they have some sort of investment back to expectation or constitutional right to the same rate moving forward. Each record stands on its own. And there was specific record evidence to each of these determinations. And in the next review, there might be countervailing evidence. And Commerce might decide the other way. But that's... In one of these cases, it shows that there are producers, exporters in China, who are minority cases that are satisfying the test. Yeah, yes. Commerce just says there are nine. There's one reviewed candidate who survived, right? Yes, and that's absolutely true. And in... It's not impossible. We spend a lot... Most of our litigation involves separate rate companies, as opposed to state-owned companies or state-controlled companies. For these reasons, we respectfully request support. In terms of how much of Crowley, how much work it did for this case, the other side seems to agree that its first argument, that it's impermissible to turn a case just on factor three, that was decided already. Yes. And secondly, whether or not article three deals with export, that whole problem, that's been decided. Right. So what's left? So what's left is their substantial evidence challenge, and there's substantial evidence on the record here, which is very similar to Pirelli. Okay. And secondly, they also argue that, as the argument was made in Pirelli, that this process being used by Commerce distorts the presumption, the way the presumption works, correct? And I think the court in Pirelli rejected that contention too. That it doesn't really matter whether this is additional evidence, where it's coming in, the factors that are being considered to try to learn why it's possible that even though the control is minority, it still could affect the management. And for any Chinese company or from a non-market economy country, there's a presumption of state control. And so if there's no record of evidence- Regardless of how much ownership there is. Right. So if there's no evidence one way or the other about control, then the agency assumes that it's owned and controlled by the government. Once a party presents some evidence indicating independence from state control, then they still maintain the burden of persuasion, and that's what Pirelli made abundantly clear. So it's an ordinary substantial evidence analysis. And here, you look at things like the board's actual control of management, the fact that the board was controlled by the minority shareholder with GTC, the overlap between the boards and management, those sorts of things. That's the substantial evidence supporting a conclusion that the companies are state controlled. Thank you. May I proceed? Please. So to start with AOLIS, which is the 49% state-owned SOE, the Department of Justice just argued that Commerce relied on website statements. But the Department of Commerce, in their second remit, they conceded that these web statements alone do not demonstrate control. That's at APPX 195. The critical evidence for the AOLIS is the rectification report. So what had happened was there was some intertwining of accounting between the SOE and AOLIS before the period of review, and that was put on as ostensibly as evidence of intertwining. But we demonstrated that, no, no, no, no, no, this has been completed. In other words, they have rectified the intertwined operations. And so there's no more. And so from our perspective, that is part of the substantial evidence showing that AOLIS is not state controlled. And Commerce initially ignored it, and then they read it, and they said, well, it's not enforceable, so it doesn't count. And we think AOLIS has carried its burden of persuasion by showing that it's entitled to a separate rate, as we submit GTC did as well. I want to talk about the switch with GTC, because when you're litigating these things from one review to the next, it's very disconcerting to put on a small amount of evidence and get the separate rate, and then put on a mountain of evidence and get denied the separate rate. And we agree they have to do more. They need to justify what's going on. And what I just heard the government say is, well, there was a majority-owned case. And so that's why we changed. That was the Diamond Saw Blades case. But that's not what happened. Because the majority ownership issue was, you know, that was already implemented in AR-5, as you'll hear soon, Your Honors, that that was the case where the majority ownership was, you know, automatic separate denial. This, we don't see. So let me see if I, this is my understanding of what I heard, and just tell me if I'm wrong. It was always clear that majority ownership was enough to conclude control. What that doesn't answer is whether lack of majority ownership is never enough or sometimes can be enough when added to something else. I heard Mr. Ticini say that what changed was that before, I guess at the time of, between A-5 and A-7, the CIT indicated and Commerce agreed that the question of majority ownership was no longer dispositive in one direction. It was always dispositive in one direction, but it was no longer dispositive in the other direction. More needed to be looked at. They hadn't looked at the other stuff in A-5, and so gave a pass to GTC after they did look at it and no longer could give a pass. Your Honor, we disagree with that characterization. That seems to be post hoc from counsel. Because if you read the remands, what they're saying is the CIT in the Sawblades case, where there was a majority owned, that's what prompted this whole change. Now, if you, our brief traces back the history here. Commerce used to give separate rates to wholly owned SOEs, and so it's never had the, eventually over time, we think in that Sawblades case was where they said, okay, majority is automatic denial. What we didn't see is this sort of nuanced approach to minority. Look, clearly that seems to have been developed, but when that happened between 5 and 7, between a company being reviewed one time to the next, that needs to be explained. That's why basic administrative law requires a heightened justification. Can I just, I, you do have, what, two more cases to argue this morning, right? Your Honor, I personally have one case, and I'm, if I can just make another wrap-up point, I'm prepared to see that the second case, the truck and bus tires, has no materially different facts, and it doesn't involve AOLIS. Then continue for a little bit. Okay. The second case is the GTC. That's right. So the GTC here is that there's nothing, I mean, even the additional, what additional, the details are virtually, if not exactly the same, very close to. It's just a different commerce decision in the second case. But still the same basic. Absolutely. So I take your point that, but even if commerce did have to explain why it changed from majority good, minority no good, to it's more nuanced view, didn't it do that? I mean, it has its rationale, which is even minority-controlled entities can be de facto government control because they can exercise control over selecting the board of directors that then exercises control of management. Isn't that the justification? I mean, that justification, you're not disagreeing with that, right? That if the government entity can, despite being a minority owner, can elect all of the board of directors, and that the board of directors chooses the management, that shows control. Well, there's two issues. One is, they didn't- Theoretically, that scenario would show de facto control, right? Well, again, we would want to see some nexus, some tethering to the operations, to the production, commercial, exports. That is in commerce's regulation. I mean, you're out on Pirelli on that.  Well, okay. Okay, so accepting that the- I'm just trying to get at the arbitrary and capricious point. Okay. Where you say they needed to give some explanation, and that the explanation they gave from five to seven, that, oh, the law changed, and now we can look at minority control a little bit more closely, that that's not good enough. Well, first of all- Why is that not good enough? The law is not some justification. It's a heightened justification. That's from the Supreme Court.  And to me, this is- But isn't- That's why, isn't that a good justification? When they say, oh, well, we were applying a very kind of simplistic rule before, and now we recognize that it's a more complex problem. And so we're going to look at the underlying evidence in the minority situations more closely to see that even if there is minority, it's still de facto. Not, your honor, when that evidence goes so heavily in the other direction. When the state ownership decreased by 10%, when the state- Well, that's not answering my question, because I'm not talking about the actual evidence. I'm talking about whether that rationale is good enough. We submit that, well, you can't separate the rationale from the substantial evidence. But as a general matter- Well, let's just say I disagree with you on the substantial evidence. I think there is substantial evidence to support that rationale. Then is that rationale that was articulated sufficient to explain the change from 5 to 7? No, we don't think it's heightened. We think it's arbitrary to say you've put on a mountain of information, and we're going to move the goalposts. We think this is a hallmark of arbitrary conduct. And just very quickly on the presumption, we would urge this court to revisit Pirelli, because it does matter, right? So we have commerce here going on and on about how we didn't carry the presumption because we didn't prove the ultimate fact. We think that is inconsistent with the way that presumption should operate in law, and we would encourage this court to revisit that and reverse the CIT's ruling on the separate rate for both of these companies. Thank you. Thank you so much. Both counsel, I guess two cases are hereby submitted, or 21? Oh, do you- Ms. Westerkamp is arguing the second one. Does Ms. Westerkamp have anything additional that she needs to add? I do not hear hers. Okay, so we will say that 2163 and 2165 are hereby submitted.